# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| KENNETH A. McCREADY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| | ) No. 04 C 1782 |
| v. | ) |
| | ) Judge John A. Nordberg |
| KAREN JACOBSEN, *et al.* | ) |
| | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

In 1999, plaintiff Kenneth A. McCready rented an apartment in Chicago from defendant Karen Jacobsen. He alleges that numerous and serious problems arose with his apartment – broken windows, holes in his floors, lack of heat, hot water, *etc*. – and that Jacobsen was not willing to fix those problems. As a result, plaintiff began withholding rent. In March 2002, Jacobsen responded by filing an eviction proceedings in Illinois State court. On April 9, 2002, the State court ordered that plaintiff be evicted and that he pay $4,000 in back rent. A week later, plaintiff filed a voluntary Chapter 7 petition in the Bankruptcy Court for the Northern District of Illinois.

In 2003, after the conclusion of the bankruptcy proceeding, plaintiff filed this action. His allegations focus mostly on the protracted and apparently bitter landlord-tenant dispute with Jacobsen that led to his eviction. But he also complains about a few post-eviction matters. His complaint, however, is not as straightforward. It is 43 single-spaced pages with 353-numbered

paragraphs and contains 14 counts based mostly on state law. Before the Court are two motions to dismiss the complaint in its entirety. The gist of these motions is that all these claims already have been, or could have been, litigated in either the state court eviction proceedings or the subsequent bankruptcy proceedings and therefore may not be re-litigated here.

## PROCEDURAL BACKGROUND

Plaintiff originally filed this case in the Central District of Illinois. Three of the named defendants – Barry Morgen, Sheldon Perl, and Jay Andrew (the "lawyer defendants") – filed a motion to dismiss or in the alternative to transfer this lawsuit to this district. They asserted that the lawsuit properly belonged in this District because the dispute arose out of a rental of an apartment in Chicago. Plaintiff filed a response brief in which he argued that the case should remain in the Central District because he lived there and it would be inconvenient for him to travel to Chicago and because, based on his experience in filing lawsuits in the Central District, that district was better suited to handle this case. The Magistrate Judge issued a Report and Recommendation, recommending that the motion to transfer be granted without ruling on the motion to dismiss. This report was adopted by the District Court, and the case was transferred here.

In this Court, plaintiff moved for an default order against defendant Karen Jacobsen because she had not yet appeared. After several status hearings, Jacobsen eventually appeared through counsel and filed a motion to quash service of summons, stating in her affidavit that she never received proper service at her residence as plaintiff had claimed. Jacobsen also moved, as part of this same motion, to dismiss the complaint on largely the same grounds asserted by the lawyer defendants.

As for the issue of service, we find that Jacobsen's affidavit is credible and that she was not properly served. An order of default is therefore unwarranted, and plaintiff's motion for default is denied. However, by appearing and filing her motion to dismiss, Jacobsen now consents to jurisdiction, and we can address these two motions to dismiss.

## THE COMPLAINT

Although plaintiff's complaint is lengthy with numerous details, many of which are repetitive and disorganized, it is clear enough that we can discern the general nature of this dispute. It is, as we have already summarized, essentially a landlord-tenant dispute.

A large portion of the complaint consists of a detailed descriptions of all the various problems with plaintiff's apartment and also with the common areas in the building. These problems included the following: his ceiling tile was falling down for years; his windows were broken; large holes were in his floors; snow was not shoveled around the building; the heat was cranked in the early evening and then dropped into the mid-50's during the night; the building had Code violations; he was overcharged for electricity; the laundry room in the basement was not secure enough and was not cleaned properly; rats and mice infested his apartment; he had no screens; the hot water in his apartment was lukewarm; and his stove didn't work for two months. There were other problems, but this description suffices to convey the gist of the dispute.[1]

---

[1] According to plaintiff, these problems were serious and affected both him, his dog, and a business that he was operating out of the apartment. For example, plaintiff alleges that, in the Winter of 2001-02, he became "constantly ill" from the failure to heat his apartment, and "[i]t was all [he] could do to huddle under the blankets on his bed and curl up into a little ball in order to try to get warm." (¶ 294.) This sickness in turn cost him $5,000 to $8,000 in lost monthly income from the business that he was operating from the apartment. (¶ 295.) To cite another example, plaintiff alleges that the holes in the floor of his apartment were so big that his elderly dog would get stuck inside them and not be able to get out until plaintiff came home. (¶¶ 304-05.)

As a result of Jacobsen's alleged failure to fix these problems, plaintiff began withholding rent. (¶ 73.) It is unclear exactly when he began to withhold rent, but he did so for a significant period of time. After Jacobsen filed the eviction proceedings in March 2002, plaintiff filed a motion to quash service of summons, which he noticed up for April 9th. On that date, however, plaintiff failed to show up. Without plaintiff present, Judge Turkington issued an *ex parte* Order of Possession awarding Jacobsen possession of the apartment and $4,000 in back rent. (Ex. B.)[2]

Thereafter, plaintiff made two attempts before Judge Turkington to get this order vacated. On April 11th, he filed his first motion to vacate, in which he explained that he had missed the hearing because there was a bomb scare and a suicide on the CTA. On April 30, 2002, he filed a second motion to vacate, arguing this time that the eviction order was *void ab initio* because Jacobsen was engaged in the unauthorized practice of law because she was really representing the owner of the building and because she was not a lawyer.

Judge Turkington eventually denied both motions to vacate. On May 8, 2002, plaintiff filed a notice of appeal with the Illinois Appellate Court, appealing the possession order and the denial of the two motions to vacate. (Ex. C.) On August 15, 2002, the Illinois Appellate Court granted Jacobsen's motion to dismiss the appeal of Judge Turkington's orders. (Ex. D.)

---

[2]This order is attached to the lawyer defendants' motion to dismiss as Exhibit B. This exhibit and the others attached to that motion will be referred to herein simply as (Ex. __). Plaintiff has not objected to the consideration of these exhibits, which are generally publicly-filed documents in any event.

On April 17, 2002, a week after the eviction order was entered, plaintiff filed a bankruptcy petition. He did so in an attempt to avoid being evicted and also because he wanted to make sure that Jacobsen would "get nothing." (Ex. H at 4; Ex. F.)

By May 4, 2004, plaintiff had moved out of the apartment. (Ex. H at 9.) In his complaint, plaintiff alleges that the move from the eviction caused the following financial, physical, and emotional injuries: (i) he "incurred thousands of dollars in moving and storage expenses" (¶ 150); (ii) his move was "disorganized and hasty" (¶ 151); (iii) he suffered severe emotional distress because "for nearly a month after [entry of the eviction order], he had no idea if the next knock on his door would not be the sheriff, there to throw him out on the street (¶¶ 152, 182); he spent "countless hours" of his own time in moving out of the premises (¶ 179); he got "stuck doing the move all by himself," and "[h]is hands were, due to the volume of material that had to be moved in such short time, caused to become claw-like and remained so for several weeks, causing him extreme pain and discomfort" (¶ 180); during the move, he "broke the quick under each of his fingernails, which didn't heal for several weeks, causing him excruciating pain" (¶ 181); and he has had "to incur thousands of dollars (as much as $50,000) in substitute housing expense" (¶ 155).

On June 2, 2002, after he moved out of the apartment and was living in downstate Illinois, plaintiff wrote a letter to Jacobsen and asked about his security deposit and some personal items (a pair of skis and an cooler). (Ex. F.) In this June 2nd letter, he told Jacobsen that he was going to file a lawsuit against both her and her attorneys and suggested that she should therefore try to settle matters by paying him "a decent dollar amount." (*Id.*)

Jacobsen apparently passed the letter along to her attorney, defendant Andrew, who wrote a letter to plaintiff on June 6th. (Ex. E.)[3] This single letter is the centerpiece of plaintiff's FDCPA claim and is really the only basis for this case being in federal court. The top of the letter contained an all-caps, bold-faced disclaimer, stating that it was being sent for the limited purpose of complying with the Chicago Municipal Ordinance and should not be construed as an attempt to collect a debt. The letter then stated that plaintiff's $1,800 security deposit would not be returned because of unpaid rent and because of $1,279 in repairs and cleaning to the apartment. Plaintiff alleges that these charges were false and that any damage with the apartment was normal wear and tear or was due to problems that Jacobsen should have fixed. (¶ 57.)

On September 30, 2002, plaintiff filed a contempt petition in the bankruptcy court against Jacobsen and the other defendants in this case, asking why they should not be held in contempt or assessed sanctions for violations of the automatic stay. (Ex. H.) Specifically, plaintiff alleged that the June 6th letter was an attempt to collect a debt in violation of the automatic stay; that Jacobsen and her boyfriend had made harassing phone calls to him and his elderly parents; that Jacobsen failed to return his personal property; and that Jacobsen engaged in the unauthorized practice of law in the eviction proceedings.

On February 28, 2003, the Bankruptcy Judge denied this petition because plaintiff failed to comply with the Court's pre-trial order and because he did not appear for an evidentiary

---

[3] Andrew actually sent two letters, one to each of two different addresses, but these letters were identical. (¶¶ 108, 137.) Therefore, we will refer to the them as if they were a single letter.

hearing. (Ex. G.) Although plaintiff attempted to withdraw his petition, the Bankruptcy Judge did not allow him to do so and specifically indicated that his petition was denied with prejudice.

Plaintiff then filed his current complaint, which contains the following 14 counts: Count I (Fair Debt Collection Practices Act); Count II (§ 1983 *et al.*); Count III (unauthorized practice of law); Count IV (conversion or unauthorized disposal of personal property); Count V (Building Code Violations Notice Posting Act); Count VI (Residential Landlord and Tenant Ordinance); Count VII (Retaliatory Eviction Act); Count VIII (Rental Property Utility Service Act); Count IX (Illinois Security Deposit Return Act); Count X (Residential Landlord and Tenant Ordinance – unlawful entry); Count XI (Trespass); Count XII (Residential Landlord and Tenant Ordinance – failure to maintain); Count XIII (Residential Landlord and Tenant Ordinance – interest on security deposits); and Count XIV (Residential Landlord and Tenant Ordinance – retaliatory eviction).

## *PRO SE* STATUS

One preliminary point. Plaintiff is prosecuting this action *pro se*. Although federal district courts often state that pleadings from *pro se* litigants should be liberally construed, we conclude that any such deference is not warranted in this case. This is because, not only did plaintiff graduate from law school, but he is also an experienced litigant who has frequently filed and prosecuted cases in federal courts.[4]

---

[4] *See, e.g., McCready v. White*, 417 F.3d 700 (7th Cir. 2005); *McCready v. Kamminga*, 113 Fed.Appx. 47 (6th Cir. Aug. 12, 2004); *McCready v. eBay, Inc.*, 2004 WL 626142 (N.D. Ill. Mar. 29, 2004); *McCready v. Harrison*, Case No. 00-1562 (S.D. Ind.), *affirmed* 67 Fed. Appx. 971 (7th Cir. June 18, 2003); *McCready v. Sales*, 03 C 9114 (N.D. Ill.); *McCready v. City of Chicago*, 00 C 4945 (N.D. Ill.);*McCready v. Michigan State Bar Standing Committee On Character and Fitness*, 926 F.Supp. 618 (W.D. Mich. 1995); *McCready v. Ill. Bd. of Admissions to the Bar*, 1995 WL 29609 (N.D. Ill. Jan. 24, 1995) *McCready v. Thomas*, 989 F.2d 500 (6th

**OVERVIEW**

Given the length of the complaint as well as the large number of claims, it is helpful to begin by making a few broader observations. First, the complaint covers two basic time periods: before and after the eviction proceedings. The primary focus of the complaint is on pre-eviction disputes relating to the condition of the apartment, which led plaintiff to withhold rent and which in turn led Jacobsen to file the eviction proceedings. Although it is not possible to perfectly categorize counts into pre- and post-eviction conduct, given plaintiff's habit of repeating and intertwining his allegations, we can state as a general matter that 10 of the 14 counts – Counts II, III, V, VI, VII, VIII, X, XI, XII, and XIV – are based on eviction-related conduct, by which we mean either the pre-eviction landlord-tenant dispute or the eviction proceedings and related matters.

The post-eviction dispute is much smaller, more discrete, and consists really of only three issues: (i) the alleged debt collection activities (the June 6th letter and the phone calls); (ii) the failure to return plaintiff's $1800 security deposit; and (iii) the failure to return plaintiff's personal items. Again recognizing that some overlap exists, Counts I, IV, IX, and XIII are based on post-eviction conduct. Specifically, Count I is a claim under the Fair Debt Collection Practices Act ("FDCPA") and focuses on the debt collection activities. Count IV concerns the personal items. And Counts IX and XIII relate to the security deposit.

---

Cir. 1993). In addition to these federal cases, plaintiff also apparently has brought a number of actions in state court because he stated in a motion filed in his bankruptcy proceeding that he needed an extension of time due to the fact that his pending state court cases were (as of 2003) so numerous that they "require[d] his daily attention." (3/28/03 Mot. at ¶ 5, Case No. 03-1589.)

Second, the complaint contains both federal and state claims – 2 federal and 12 state claims.  In fact, one of the two federal counts, Count II, has already been dismissed by this Court (*see* 10/07/04 Order), leaving the FDCPA claim in Count I as the only federal count.  Because there is no diversity jurisdiction, the only basis for jurisdiction over the 12 state law claims is supplemental jurisdiction based on this single FDCPA claim.  To summarize, this dispute primarily focuses on the eviction-related activities, and it predominantly involves state law claims.

Defendants move to dismiss all the claims under the *Rooker-Feldman* doctrine and the *res judicata* doctrine because (they argue) these claims were raised, or could have been raised, either in the eviction or bankruptcy proceedings.  The lawyer defendants additionally move to dismiss the FDCPA claim for failure to state a claim under Rule 12(b)(6).

## **THE *ROOKER-FELDMAN* DOCTRINE**

We begin with the *Rooker-Feldman* doctrine because it is jurisdictional.  *See Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554-55 (7th Cir. 1999) ("Because the *Rooker-Feldman* doctrine is jurisdictional in nature, its applicability must be determined before considering the defendants' arguments regarding the applicability of *res judicata*.").

The *Rooker-Feldman* doctrine, as recently described by the Supreme Court, bars federal actions "brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 125 S.Ct. 1517, 1521-22 (2005).  As this quotation suggests, a key point of the inquiry is whether the plaintiff is seeking, directly or indirectly, to overturn the state court judgment.  For example, in the original

*Rooker* case, the plaintiff filed a federal lawsuit and specifically asked the district court to declare the state court judgment "null and void." *Id.* at 1521. Any such attempt to "overturn" or "undo" a state court judgment thus violates the *Rooker-Feldman* doctrine. *Id.* at 1526, 1527; *GASH Assocs. v. Village of Rosemont*, 995 F.2d 726, 728 (7th Cir. 1993) (*Rooker-Feldman* applies if "the federal plaintiff [i]s seeking to set aside the state court judgment").

Although a party may not seek to undo a state court judgment, it may file a claim in federal court if that claim is distinct from the judgment itself. *Long*, 182 F.3d at 555; *GASH*, 995 F.2d at 728. Determining when a claim is distinct from a judgment is not always an easy task and often presents "very difficult and close questions of law." *Long*, 182 F.3d at 554. This is partly due to the fact that *Rooker-Feldman* applies "not only to claims that were actually raised before the state court, but also to claims that are inextricably intertwined with state court determinations." *Id.* In this sense, *Rooker-Feldman* is similar to *res judicata*.

The Seventh Circuit has held that it would be unfair to apply this doctrine if the plaintiff was unable to raise the claim in state court due to state court procedural rule. In *Long*, which is a case that plaintiff here relies on heavily, the plaintiff was evicted in a state court proceeding and later went to federal court asserting various claims, including an FDCPA claim. The FDCPA claim was based on a letter sent to Long before the eviction proceeding. Although the Seventh Circuit held that most of her claims were barred by *Rooker-Feldman*, it held that the FDCPA claim based on this letter was not because it could not have been asserted in the Illinois eviction proceeding, which does not allow a party to raise matters "unrelated to the issue of possession." *Id.* at 559 (quoting *Walliser*).

In addition to these principles, the Seventh Circuit has expressed a general concern in *Long* and other cases about the possibility that a losing state-court litigant might attempt to "circumvent the effect of *Rooker-Feldman*" by re-casting his federal complaint into, for example, a "civil rights action" that ultimately was nonetheless nothing more than an attempt to reverse the state court judgment. *Id.* at 557; *see also Ritter v. Ross*, 992 F.2d 750, 754 (7th Cir. 1993) (noting same concern); *GASH*, 995 F.2d at 727 (applying *Rooker-Feldman*: "Dominating this case is a simple fact: GASH objects to the outcome of a judicial proceeding and filed a separate suit to get around it."). Other federal appellate courts have expressed a similar concern. *See, e.g., Guess v. Bd. of Medical Examiners of the State of North Carolina*, 967 F.2d 998, 1005 (4th Cir. 1992) ("Artificial attempts to redefine the relief sought are not sufficient to overcome the requirements of *Feldman*.").

In considering the possible application of *Rooker-Feldman* to this case, we find that it is helpful, at least as an initial step in the analysis, to consider plaintiff's complaint as a whole rather than on a count-by-count basis. When viewed from this broader perspective, it is clear that this lawsuit is at some level a challenge to, and an effort to overturn, the State court's eviction order. This conclusion is suggested first of all by the fact, noted above, that the complaint consists mostly of state law claims arising mostly out of eviction-related activities. But it is further supported by the following three facts.

First and most directly, in several places in his complaint, plaintiff directly asks that we overturn the state court judgment. For example, in the prayer for relief to Count II, he requests that we enter an order "vacating all of [Judge Turkington's] orders and judgments in the underlying civil eviction action." In paragraph 218, he asks that we give him back possession of

his apartment. In several other places, he asks that we order Jacobsen to "tender a [new] lease" to him. (Prayer for relief to Count VII; *see also* Prayer for relief for Count XIV (same).) These allegations thus make clear that at least some significant part of plaintiff's complaint is an attempt to undo and "set aside a state judgment." *GASH*, 995 F.2d at 728. In this sense, this case is similar to the original *Rooker* decision.

Second, almost all of plaintiff's alleged injuries resulted directly from the eviction order and the fact that he was forced to move out of his house in an abrupt manner and then had to find another place to live and work. These injuries – financial, physical, and emotional – are featured prominently in the complaint and are repeated in various counts some of which (as discussed further below) do not even relate to the eviction. These injuries would not have occurred if the state court had not entered the eviction order. Therefore, to the extent that plaintiff is seeking to recover for these injuries, his claims are barred by *Rooker-Feldman*.

Third, in his June 2nd letter, plaintiff refers to the "eventual lawsuit" that he will file against Jacobsen and her attorneys. Although plaintiff asks in this letter about two of the post-eviction matters (his security deposit and personal belongings), he states at the end of the letter that his motivation in filing the lawsuit is the eviction-related conduct. Specifically, he states: "Lastly, just so's you don't forget, this is all because you unreasonably refused to fix my ceiling and floors or, alternatively make some reduction in rent." (Ex. F.) To the extent that plaintiff is trying to re-litigate in this lawsuit the question whether he was justified in withholding rent, this is a question that was clearly at the heart of the eviction proceedings and one that cannot be relitigated under the *Rooker-Feldman* doctrine.

Plaintiff is an experienced litigant who clearly recognizes that *Rooker-Feldman* presents a significant barrier to his lawsuit. He raises two primary arguments as to why it should not apply here. The first is that the state court had no jurisdiction because Jacobsen, who is not a lawyer, was engaged in the unauthorized practice of law because she represented the owner of the apartment building in the eviction proceeding. Plaintiff is correct that, if the state court lacked jurisdiction, then this is an exception to *Rooker-Feldman*. *See Schmitt v. Schmitt* 324 F.3d 484 (7th Cir. 2003). This is sometimes referred to as the *void ab initio* exception. But this exception does not help plaintiff here because, as both the state court judgment order as well as plaintiff's own complaint make clear, Jacobsen did not appear in that action as an attorney representing *another* party but instead was representing *herself*. (*See* Ex. B.) Thus, as defendants correctly point out, plaintiff's argument is not one going to jurisdiction. Therefore this exception does not apply.[5]

Plaintiff's other main argument to avoid *Rooker-Feldman* is to point to his post-eviction allegations and in particular to his FDCPA claim. He correctly points out that this claim could not have been raised in the eviction proceeding because it did not arise until *after* that proceeding. And he further correctly points out that he, like the plaintiff in *Long*, could not have asserted such a claim in the eviction proceeding. Based on these arguments, plaintiff appears to have mounted at least a technical defense to the application of *Rooker-Feldman* to this one count and perhaps a few others.

---

[5] Moreover, the Seventh Circuit has rarely found this exception to be applicable. As explained *Schmitt*, this is because "the Illinois state courts [are] competent to determine their own jurisdictional boundaries, so there is no need for the federal courts to intervene." Plaintiff, in fact, has raised this *ab initio* arguments three times already, first before Judge Turkington, then to the Illinois appellate court, and then to the federal bankruptcy court.

But circumstantial evidence suggests that plaintiff has asserted this FDCPA claim, not because he is upset by the alleged violation, which as we explain below is a trivial and technical violation at best, but precisely because it provides a way to avoid *Rooker-Feldman* and to bring along his state law claims via supplemental jurisdiction. To the extent this is true, it would implicate the concern raised by the Seventh Circuit that parties should not be allowed to creatively plead around *Rooker-Feldman*.

The circumstantial evidence supporting this view is three-fold. First, as noted above, plaintiff indicated in his June 2nd letter that he had already decided to file this lawsuit and that his primary motivation was Jacobsen's alleged failures to fix his apartment. Plaintiff was thus preparing this lawsuit *before* he even received the June 6th letter that constitutes the FDCPA violation.

Second, plaintiff spends most of the time in Count I complaining about injuries that have nothing to do with the alleged FDCPA violation. Consider, for example, paragraph 150, which is typical of his other FDCPA injury allegations: "Plaintiff has, *due to the unlawful collection activities of these Defendants*, incurred thousands of dollars in moving and storage expenses, during and following the eviction proceedings." (Emphasis added; *see also* ¶¶ 149-155.) By inserting the boilerplate phrase italicized above, plaintiff tries to establish a causal link between the FDCPA violation and his various moving-related injuries. But it is clear that this causal linkage can only be grammatical in nature. Putting aside the question of how a harassing letter or phone call by itself could ever cause a person to suddenly move out of his apartment, the June 6th letter was sent *after* plaintiff had already moved out of his apartment and therefore could not

have been the cause of these moving-related injuries as plaintiff claims.[6] The fact that plaintiff has tried, in this convoluted manner, to recover in his FDCPA claim for moving-related injuries suggests that it is really those injuries, rather than any alleged FDCPA violation, that are motivating this lawsuit.

Third, plaintiff is a frequent filer who is well-versed in the nuances of both the *Rooker-Feldman* doctrine and the FDCPA. In fact, in two earlier cases, federal district courts expressed concern that he was trying to creatively plead his way around *Rooker-Feldman*. *See McCready v. Michigan State Bar Standing Committee On Character and Fitness*, 926 F.Supp. 618, 620 (W.D. Mich. 1995) (stating that McCready's amended complaint appeared to be an "attempt[] to circumvent," by artful pleading, the Court's earlier ruling that those claims were barred by *Rooker-Feldman*); *McCready v. Ill. Bd. of Admissions to the Bar*, 1995 WL 29609, *4 (N.D. Ill. Jan. 24, 1995) (dismissing most of McCready's claims pursuant to *Rooker-Feldman* because the "overwhelming thrust" of his lengthy, multi-count complaint was "nothing but a challenge [to] the denial of Plaintiff's license to practice law in Illinois" rather than "a general constitutional challenge" as McCready attempted to portray it). In addition, plaintiff is also well-versed in the FDCPA and has unsuccessfully asserted such claims on at least two prior occasions arising out a business dispute. *See McCready v. Kamminga*, 113 Fed. Appx. 47 (6th Cir. 2003) (asserting FDCPA and various state law claims against seller of snowmobile); *McCready v. Harrison*,

---

[6]We do not know the exact date the alleged phone calls were made but the complaint suggests that they too were made after the eviction order.

Case No. 00-1562 (S.D. Ind.) (asserting FDCPA claim and various state law claims against a motorcycle repairman and his lawyer), *affirmed* 67 Fed. Appx. 971 (7th Cir. June 18, 2003).[7]

All of the above evidence, when considered together, strongly suggests that plaintiff is asserting this FDCPA claim purely as an "artifice" to "circumvent" *Rooker-Feldman* and as a way to continue waging his ongoing battle to get back at Jacobsen for her alleged failures as a landlord. Nevertheless, we do not think that this is a firm basis for dismissing this claim in part because the Seventh Circuit, despite expressing concern about this general possibility, has never suggested that a court may dismiss an entire complaint based on this type of analysis. In fact, in *Long*, the Seventh Circuit proceeded on a count-by-count basis, dismissing some claims based on *Rooker-Feldman* while allowing others to proceed.

Viewing the complaint here on a count-by-count basis, it is clear that a number of the 14 counts could have been raised in the eviction proceedings. Specifically, Counts V, VI, VIII, and XII are based on plaintiff's failure to pay rent and thus could have been raised in those

---

[7]Plaintiff also has a history of, as in this case, threatening to file multiple and time-consuming lawsuits if he does not get his way. In particular, in July 2002, plaintiff was also involved in a dispute with eBay in which he sent a series of emails threatening to sue if his account privileges were not reinstated. These emails were later attached *by plaintiff* as an exhibit to his contempt petition that he filed against eBay in the same bankruptcy proceedings involved in this case. *See McCready v. eBay, Inc.*, 2004 WL 626142 (N.D. Ill. Mar. 29, 2004). In these emails, plaintiff first threatened to bring a "storm of litigation" if his account was not restored. When this request went unfulfilled, he again threatened a lawsuit, stating: "You are shortly to be named in a HUMONGOUS federal lawsuit." He then filed a contempt petition against eBay in his bankruptcy proceeding. But that was not enough. While that petition was pending, he indicated that he was prepared to also file a second lawsuit in federal court and that it would consist of numerous and mostly state law counts. Tellingly, however, he indicated that all of these counts would be "premised on only ONE email you've sent in which you were attempting to collect unlawful debt obligations." Thereafter, plaintiff sent one more email, again threatening a lawsuit of diluvial dimensions: "I will bring a flood of litigation unto you of Biblical proportions!"

proceedings. Other are less clear-cut and would require more difficult determinations as to whether they were "inextricably intertwined" with that proceeding. And, as noted above, a few of the counts relate to post-eviction conduct. For reasons that will be explained below, we find that the better approach is to instead consider the other arguments for dismissing the FDCPA count because, if it is dismissed, then the state law claims can be dismissed on the alternate jurisdictional ground of lack of supplemental jurisdiction.

### *RES JUDICATA*

Defendants argue that the FDCPA claim is barred because it was raised in the bankruptcy proceeding. As an initial matter, *Rooker-Feldman* is not applicable because it only applies to "state-court losers" and not to an earlier federal proceeding. *See Exxon-Mobile*, 125 S.Ct. at 1521-22; Wright & Miller, § 4469.1 (*Rooker-Feldman* does not "govern[] relations among federal courts").

As for *res judicata*, it is true that plaintiff raised the general allegations underlying the FDCPA claim in his contempt petition and that the bankruptcy court denied that petition with prejudice, thus potentially giving it *res judicata* effect. However, it appears that plaintiff never asserted an FDCPA claim in bankruptcy court and, insofar as we are aware, could not have asserted such a claim. The contempt petition did allege generally that the defendants here were willfully trying to collect a debt in violation of the Bankruptcy Code. Although this sounds very close to the FDCPA allegations here, the two claims are not coextensive as the Seventh Circuit explained in *Randolph v. IMBS, Inc.*, 368 F.3d 726, 731-32 (7th Cir. 2004) (holding that the Bankruptcy Code does not preclude or impliedly repeal the FDCPA because these two schemes, although similar in some respects, differ in that "the FDCPA sets a lower standard of liability

-17-

and provides lower damages" and thus the two schemes may co-exist). For this reason, although it is a close question, we conclude that *res judicata* is inapplicable.

## **THE FDCPA CLAIM**

We now consider the lawyer defendants' assertion that this FDCPA claim should be dismissed under Rule 12(b)(6) for failure to state a claim. For the reasons set forth below, we agree.

The FDCPA claim has two parts. First, plaintiff alleges that Jacobsen and her boyfriend made harassing phone calls. This allegation fails because the FDCPA only applies to "debt collectors" and not to "creditors." *Id.* at 729 ("A distinction between creditors and debt collectors is fundamental to the FDCPA, which does not regulate creditors' activities at all."). The complaint explicitly states that Jacobsen was a "creditor" of plaintiff (¶ 8), a conclusion that is reinforced by the allegation that she was acting as plaintiff's "landlady" (¶ 7). She is therefore not a debt collector, and the FDCPA claim fails with respect to her. *See, e.g., Goodloe v. Nat'l Wholesale Co.*, 2004 WL 1631728, *13 (N.D. Ill. July 19, 2004) ("Because Goodloe fails to assert any facts indicating that Defendants are 'debt collectors' within the meaning of the FDCPA, the claim must be dismissed.").

Second, as for the June 6th letter, there is no issue at this stage as to whether the lawyer defendants were "debt collectors." At issue, however, is whether the June 6th letter was an attempt to collect a debt that would trigger the various requirements of the FDCPA. The lawyer defendants claim that it was not an attempt to collect a debt but was simply an attempt to respond

to plaintiff's June 2nd letter requesting information about his security deposit and also to comply with the Chicago Municipal Ordinance regarding security deposits.[8]

We find that this letter was not an attempt to collect a debt and thus did not trigger the FDCPA requirements. This conclusion is based on *Bailey v. Security Nat'l Servicing Corp.*, 154 F.3d 384 (7th Cir. 1998), in which the Seventh Circuit concluded that a letter to sent to the plaintiffs was not an attempt to collect a debt because the letter "merely inform[ed]" them of the status of their accounts and because it did not "demand" any payment whatsoever. *Id*. at 388-89. Similarly here, the June 6th letter merely explained the reasons why the security deposit was not being refunded, and it indisputably did not demand payment in any way.

Plaintiff tries to get around this point in his complaint by awkwardly alleging that the lawyer defendants were actively engaged in collecting a debt "by virtue of having failed to return the Plaintiff's security deposit." (¶ 133.) In other words, they were actively collecting a debt by simply doing nothing. This interpretation is counterintuitive, and we could not locate any case suggesting that an FDCPA violation exists in this type of situation. This interpretation is also inconsistent with the purpose behind the FDCPA. It is hard to see how the June 6th letter could have been viewed as harassing by plaintiff given that the letter merely supplied information that he himself had requested and given that he was an experienced litigant well-versed in the FDCPA and was at that time actively preparing a lawsuit against these same individuals.

---

[8]An initial question also exists as to whether the debt here, which is apparently the rent, is even a debt that is covered by the FDCPA given that plaintiff has alleged that he used this apartment both to live in and to operate his business. The FDCPA only applies to debts incurred "primarily" for personal, family, or household purposes. 15 U.S.C. § 1692a(5); *see Fleet Nat'l Bank v. Baker*, 263 F.Supp.2d 150, 153 (D. Mass. 2003) (the FDCPA only applies "to consumer debts, not business loans"). But this question is not suitable for resolution on a motion to dismiss because it requires further development of the factual record.

## CONCLUSION

For the reasons set forth above, Count I is dismissed with prejudice. Having dismissed the only remaining federal claim, we dismiss the remaining state law claims for lack of jurisdiction. This concludes this lawsuit.

**ENTER:** 9/22/05

*[signature: John A. Nordberg]*

**JOHN A. NORDBERG**
**Senior United States District Court Judge**